All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. I present to you the United States as a former court. Good morning. Please be seated. Before we get to today's argument, we have the pleasurable task, well, not to suggest  that, but I guess we have the more pleasurable task of a motion by Judge O'Malley, so I'll turn to her. All right. Well, I have the pleasure of moving the admission of my law clerk, Michael Chafone. I'm sure everybody's here for this occasion rather than for the argument itself. I am familiar with his credentials. He graduated from the University of Delaware with a Bachelor of Science in Chemical Engineering, worked as a chemist for four years before going to George Washington University School of Law, where I graduated with multiple honors. He then had the pleasure of clerking for Leonard Stark on the District of Delaware, and we know he got a lot of patent experience there, and he's been clerking for me for the past year. I know that he possesses all the requisite qualifications. I know that in addition to his great past, and despite working for me, he's landed on his feet. He's going to work at a small law firm called Covington & Burling here in D.C. So with all of that, I move his admission. He is a member of the bar in good standing of the highest court of Delaware and New Jersey, and as I said, I have knowledge of his credentials and am satisfied that he possesses all the necessary qualifications to be a member of this court. I will be sorry to lose him here, but I look forward to you appearing before us. So I move his admission. Do you need to deliberate? No. It's granted enthusiastically. Thank you. Please be seated. Your Honor, do you solemnly swear that you will conform yourself to the determinant's counsel in this court, and by the authority of the law, submit it to the support of the Constitution of the United States of America? I do. Congratulations. Thank you. Thank you. This morning, we hear case docket number 131129, Apple vs. Santa Clara. Mr. Lee, whenever you're ready. Thank you, Your Honor. May it please the court, my name is Phil Lillian, and together with my partner, Warren Fletcher, we represent Apple. Almost one year ago, the jury returned a verdict finding that Sam Summings framed six Apple bets and diluted Apple's trade risks by selling 26 different products. In deciding the JOL motions, the district court has upheld each of the liability findings that are relevant here. Then, in addressing our request for permanent judgment relief, the district court expressly found Sam Summings' sales of the infringing product have caused irreparable harm to Apple in the form of lost downstream sales and lost market share to its primary direct competitors. Despite those findings, the district court concluded, and it said, I quote, as the first and most important reason for denying the injunction, that Apple had not proved a sufficient causal nexus between Sam Summings' infringement and Apple's irreparable harm. But respectfully, the district court adopted a causal nexus standard that this court has never applied in the permanent injunction context or in the preliminary injunction context in Apple I and Apple II. Rather than requiring Apple to show some connection between the sale of the infringing products or the patented feature and Apple's irreparable harm, or even that the patented features were a driver of consumer demand, the district court required Apple to prove that each of the patents she was doing separately was a driver of purchasing. So that goes to the so-called aggregate, what she termed the aggregate analysis of individual patents versus considering all the patented infringements together, right? I think it does. That's in part, Your Honor. And I think it also goes to the test she applied to each. In analyzing each of the different patents and their relationship to irreparable harm, she used that as a standard. That's a little more apparent with her analysis of the utility patents, perhaps, than the design patents, right? Your Honor, I'm not sure that it's that clear from opinion. I think that for each of them, while she found irreparable harm, while she found that design and utility patents contributed to the consumer's buying decision, she found it to be an insufficient causal nexus. And maybe I can answer the question this way and go directly to the point on causal nexus. We represented to the court that since eBay, no federal certification or Supreme Court decision has required a causal nexus in a permanent injunction context. To ensure that we were correct, we've looked at all of the post-eBay decisions of this court. There have been about 44 that have substantively addressed the question of what's required for a permanent injunction after the adjudication of infringement. Well, I take your point, and I think the briefs really articulate that. But let me ask you, assuming that there is a nexus requirement for a moment, which you happily assume in your briefs as an alternative, what do you think is a reasonable formulation of such a causal nexus? Let me answer that in two ways, your Honor. And first, if I take the assumption, which is there's some connection required, you can have the requirement of some connection, which I think is articulated in Apple I, to a driver of a consumer purchasing decision to the sole driver of the purchasing decision. For sure, that latter standard, which I think the District Court applied, is too rigid, and would categorically deny injunctions to multifunction products. I think the answer most directly to your Honor's question is this, for a permanent injunction request post-adjudication of infringement. And I would start it this way and say what it's not and then what it is. It is not. We are not contending that an adjudication of infringement leads like night follows a day to an injunction. That's precisely what was rejected in eBay. We are not contending that an adjudication of infringement leads like night follows a day to satisfaction of the first factor of eBay, irreparable harm. You could have a non-practicing entity that's proved infringement, adjudicated infringement, but doesn't have irreparable harm. We are saying this, when there has been adjudication of infringement, and under 271, the products that infringe are what's an issue that contain the features, then that adjudication of infringement, if the sale of those products causes irreparable harm, that's enough of a connection. So it is the adjudicated infringement of products that infringe that supplies the connection. And we think that that's enough. Now, that's not to say that Jeff Brice's question about the cupholders is still not relevant. And I wasn't here for that argument, but I've read and thought about cupholders. Those cupholders, we submit, get addressed in factors three and four, balancing the hardships and public interest. And in fact, this court has done that twice. In the Broadcom case, there was a sunset phasing period. It was a multi-function product. The two patents that were adjudicated to be infringed involved a walkie-talkie feature and simultaneous communication. But the products themselves, and this is a pre-Apple I and Apple II permanent injunction case, the products themselves allowed for baseband communications, graphics, video compression, a host of other functions. And what the court did is it said there's indirect competition. There's the sale of this chip. This chip infringes. What we're going to do is, in joining the sale of this chip, what we're going to provide under factor three, balancing the hardships, a period of time during which the feature can be phased out or redesigned. This court blessed that as a carefully crafted balancing of the respective interests of the partners. Now, what happens with that type of sunset provision, and there was one in I4I as well, this court changed from three months to five months. What happens is this. If the feature truly is unimportant, if the feature is not key to the person's decision, then it will be designed out at the end of five months or two years, or however long the sunset period is. But if you get to the end of the sunset period, a period of time when technologically and practically you can find it out, and it's still there, then that tells us in real-world terms that it is important to the sale of the product, and it should be enjoyed at that point. Let me turn to Judge O'Malley. Well, I actually was going a little bit to where you were going, and that is that you do argue that there should be no nexus requirement at the permanent injunction stage. And the problem with that is, regardless of how you define it, even if you don't find those words used in all those cases, if you look at the facts in those cases, there seems to be a nexus, at least in the common tort sense. I mean, I can't imagine that you wouldn't have some nexus requirement, regardless of how you define it, in every case in which a permanent injunction was considered. Your Honor, that's why I tried to use the word, a connection, because certainly if we had demonstrated loss of market share, and it was because we had eight senior executives who had been indicted for felonies in a variety of countries, and that's why our market share dropped, there would be no connection. But when there has been an adjudication that certain products in French, and the sale of those products have caused irreparable harm, that's the connection, that should be enough. And let me answer your question, because I think the other cases this Court has decided are important. If you look at Bosch and Presidio and Douglas, one decided before Apple I and Apple II, two decided after Apple II, all of them either affirming the entry of a permanent injunction, or twice decisions vacating the denial and ordering the entry of a permanent injunction. In all three of them, the invention was just one small component of a multi-featured product. So in Douglas, the most recent, it was a latch on the snow plow assembly. But the claim was a snow plow, a snow plow assembly, and then the latch was one of the limitations. There was absolutely no proof that the latch drove demand for the snow plow or snow plow assembly. None at all. But this Court vacated the denial and remained it for entry of an injunction. If there was a requirement of the causal nexus that was used by the District Court here, that could never have occurred. The same is true in Presidio. It's a monolithic capacitor, this claim. The claim is what you'd expect. It claims a monolithic capacitor. But the key limitation is a fringed effect capacitor. And that opinion is particularly instructive for this reason. The Court actually addressed the question of whether that limitation, fringed effect capacitor, drove consumer demand. And it did it in the context of lost profits in the candidate factor and said, you don't have to prove that. There's no evidence here. And then the Court got to the permanent injunction issue and said, permanent injunction should have issued. If you compare the claims in those three cases to claims issued here, all of the claims of the, for instance, Kilby patents, claim the device with a feature being part of the device, the claims are in absolute parallel. So is it your position that we couldn't adopt a nexus requirement in this case, any kind of nexus requirement in this case, barring an unadopted determination? No. We're not saying that at all. I think that we think that the case, we think that the case, the preliminary injunction cases, the permanent injunction cases, while the standards overlap some, are different. The contexts are different. This Court said so and added. Well, on that point, it was the one part of your argument, and I recognize the backup argument, because you think the causal nexus should not be present for either preliminary or permanent. But I found the distinction that you drew between preliminary and permanent with respect to the causal nexus requirement to be a little unclear. So why does it make a difference? I understand there are differences between preliminary injunction and permanent injunction, but why does that make a difference with respect to this particular requirement? Your Honor, I would say for three reasons, and I think actually this Court's decision in Abbott captures it. It talks about the fact that under Amico, the standards for preliminary and permanent injunctions overlap substantially, and many of the words are the same and mean the same. But this Court said, but in the preliminary injunction context, the manner in which you balance those factors is different. Why? Here are the three reasons. The first is, the preliminary injunction context occurs before there's been an adjudication of infringement. You have to make a judgment as to whether there's a likelihood of success. Here, there's been an adjudication of infringement. Reason number two, as a consequence of reason number one, in the preliminary injunction context, you are changing the status quo. You're changing the status quo before anybody has had an opportunity to determine whose rights are being infringed, if at all. In the permanent injunction context, all you're doing is entering an injunction to conform behavior to adjudicated rights. And the third thing goes to the Broadcom I-IV-I factors for rebalancing injunctions, the phase-in, sunset, the couple. In the permanent injunction context, you can balance the considerations of the parties. You can address the importance of the feature to the product by phase-ins, sunsets. Now, theoretically, I guess you could do that. In a preliminary injunction context, it makes a lot less practical sense. The idea that you would phase in a change on a preliminary injunction basis doesn't make much sense. But what was done in Broadcom, what was done in I-IV-I, demonstrates that the balance can be struck, I would suggest, pretty easily. You enter an injunction that says, stop selling the products that have the infringing feature. Stop selling the infringing feature. You will have X number of days to design it out. How do you respond to your friend's argument on the other side that says that you waived that Broadcom I-IV-I argument or waived any right to access them, to make that a part of our analysis? Your Honor, I have two responses. One is, and you'll see in the footnote in our client brief, we raised this issue at below, and we've raised the issue here. There's been no waiver. The second thing is, at least if I understand the argument, the question of what type of injunction should be crafted to address a situation like this. Your Honor, this is a situation in which, and this is the proof we described in our brief, this is a situation in which Apple spent five years and five billion dollars designing a product. It was a revolutionary product. It's hard for most of us to remember what a phone looked like in 2007, but it was revolutionary. This is a case in which Samsung looked at it immediately and said, this is easily copied, but we don't need to because it's going to be unsuccessful. And it's a case in which two years later, they had a summit and decided to copy it. They spent three months, three months copying and brought the product to market. And the result was what's on page 18 of our opening brief. You see what happened to the marble chair. That is a situation in which, it's a classic case in which an injunction should issue. Can I, just a quick question on damages, and then I do have, I think we want to turn briefly at least to the dilution issue. But on damages, this comes up with respect to the loss of downstream sales. As part of the case in chief on damages, did Apple include evidence with regard to downstream sales and those losses? Was that part and parcel of your damages case? The damages case was principally, was based upon historical sales. So it was sales that had occurred, and I don't remember the precise date, it was to a date in 2012, but it was historical sales only. So the loss, sales of the infringing products, half of it they were not included. The downstream sales, which I would include as other products, as part of the Apple system. I buy an iPad, I also want an iPhone, I also want an iMac. It was not included as damages, it was included as proof of irreparable harm. And the lost market share was an issue, because it went to questions like reasonable royalty. But there was not any request for compensation for the lost market share, as well as the lost market share. I don't know if downstream sales, but trial court made a specific finding on that, right? Yes. There was a loss of downstream sales. There was a loss of downstream sales. The trial court found that we had demonstrated greater irreparable harm than we had at the preliminary injunction stage, that there were lost sales of the infringing products, which I think is a connection that I think you have to have for permanent injunction purposes. She found there was lost downstream sales. The only case she found yet that's typical on these issues is whether there were ecosystem issues. And she just said she wasn't making a determination on that. But she said, notwithstanding that, if you put it all together, it is irreparable harm. I take it that, well, Samsung represents, and you can tell me whether you agree with this, that I think 23 of the 26 adjudicated products with respect to the patents are not being sold anymore, at least anonymously. And the other three have designed around, in their view at least, avoid infringement. Do you agree with it? Perhaps you don't know with respect to the three, but do you agree with respect to the 23? No, Your Honor, and here's the reason why. This is a place where we have to be very careful to consider what Samsung's business model is. Unlike Apple, which introduces one new phone a year or so. I understand they introduce a lot of phones. So if you look at the evidence they cite to you, this product is off the market. What they're saying to you is, the product with that name is off the market. There's another product on the market, and for a number of them, we say they still have infringement. Which is where we get to the not colorably different part of the judgment. My question ultimately is this. Is what we're basically here about today all about the process that's going to be employed if you go after some of these renamed, let's call them, phones as being, suppose you get an injunction. And it's a not colorably different clause injunction. That process would then be in contempt of proceeding if you wanted to have those phones adjudicated as within the scope of the injunction. That would require you, I think, to prove that they actually do infringe. Right? Right. So are we here about whether that process is to take place in front of the trial court in a contempt proceeding as opposed to in a new adjudication of infringement? And is that really all that is at issue here? I mean, that may understate the importance of that distinction. But is that really what we're dealing with? Your Honor, let me answer that in two ways. One case-specific and one a little bit more broadly, if I could. The district court specifically said in footnote 4, page 7 of its opinion that it was offering no view on whether the sign-arounds had been effective sign-arounds or not. We can test whether the sign-arounds are effective. Okay. Okay. But then the question comes up, what's the context in which that contest is going to be played out? Without a doubt, Your Honor, if we were to obtain an injunction, had it included the not colorably different, the context in which it will play out in a contempt proceeding, where we do have to prove infringement, but all the other issues are going to be different than commencing a new follow-on proceeding, a new district court proceeding, a new jury trial, right? On another set of problems. Well, let's assume that you prevail on appeal and that you are entitled to collateral estoppel on all the issues that were in dispute in the first statute. There's not going to be a whole lot left, I don't suppose, is there? I don't think... I think the primary issue would be whether the new product infringes or not. And, you know, it is a distinction of some significance. In fact, in the Broadcom case, rather, after this injunction was affirmed by this court, there were four contempt proceedings, three of which went to decision, all of which were under the colorably different portion of the injunction. But I think, if I could, there is a broader issue here, because of the rule that the district court has imposed. It is close to a categorical rule that for a multi-function product, you cannot get a permanent injunction. Could we prove that each of these three patents, three design patents, three utility patents, are the driver, the driver of a consumer purchasing decision? I'm not going to stand here and tell you that we could. I don't think we can. I don't think that anybody in Atlas circumstances could. That standard, which we categorically deny, relates to a group of type of patent and type of product, we suggest has three problems. One, it would be inconsistent with eBay. It would be precisely the type of categorical rule that eBay discourages. Second, it really would call into question whether it was consistent with Section 154 and the statutory right to exclude. But third, and most importantly, it would work a fundamental change in American intellectual property law. And again, the best indication I can give this court is that this panel considers all of the post-eBay permanent injunction patents. And literally there are, by my count, 44. Some of them are simple products. Some of them are complex products. The vast majority involve claims where the products claim, but there's just one innovative element. None of them say cost and access. None of them say even connection. But most importantly, none of them require that the latch in box, the fringe effect to patent in Presidio, be the driver of consumer demand. It would be a standard that would work a fundamental change. I understand that if you were to prove, for instance, that one of your patented features was the driver of consumer demand, then I assume that you disprove that your others are the driver of consumer demand. That's the irony, Your Honor. If you had one patent and you could prove it was the driver, you'd get an injunction. If you had six innovations, as we have here, that collectively revolutionized the industry, but also drove the consumer purchasing decision, you would be out without an injunction. And that's based on her analysis of the aggregate. Yes. Let me turn you to the trade trust issue. Now, we're dealing with a different group of products, so I don't know if they seem to be off the market, whatever the six products are or whatever. I don't know. Your Honor, there is one design patent we don't practice anymore. It's a consequence of the trade dress that we prevailed on at trial. The district court assumed that we didn't practice it. We're not contesting that. It stems from the claim that it's not practicing or selling products. Well, let's take that. Let's assume that for purposes of my question, which is, where in your view does the law stand? We seem to have competing Ninth Circuit cases. And so do we just come out with it's a factor that can be looked at, that is, whether the infringing party continues to practice it, and we review that, obviously, under an abuse of discretion? Is that where we're left under the case law? I don't think so, Your Honor. I think where we ought to start is Section 1125, which is the provision that governs. And if you look at 1125, it doesn't say anything about the owner of the trade dress having to continue to sell products that have the trade dress. And there's a reason. If you think about the Apple products, that's trade dress. No, let's take that off. I'm talking about Samsung continuation. Same answer. If you look at 1125, there is nothing in 1125 that requires that the adjudicated infringer continue to sell products with the trade dress. No, but that's my question. Whether it's required or not, let's assume there's no black letter about it. The question is, we're reviewing her analysis under abuse of discretion. And so do you agree, or if you're reading of the case law, that this is an impermissible factor to consider, or simply that it's a matter of weight under an abuse of discretion? Your Honor, I think there are very few factors that you couldn't consider under the broad umbrella such as the principle of equity. But I would say two things. In the permanent injunction analysis under the patent law, the court says no burden on Samsung because they claim not to defend. We get to 1125, trade dress, and she says, no injunction because they're not defending. I think if we step back from it, this is a place where whatever consideration we give ought to be driven by principles of equity and common sense. They have been determined to have infringed the trade dress. An injunction that says don't do it anymore is the correct remedy. If they truly are not doing it anymore, then they won't be burdened, there'll be no further disputes, there'll be no contempt proceedings, but no one will be abusing our trade dress. A decision that says someone can stop, and they have it represented, they'll never do it again. Someone can be adjudicated a trade dress deliverer. They can claim that they stopped, that we will then be denied an injunction as it puts the burden on the wrong party. That's why I say we're not going to say categorically you can never consider it, but it's a factor that ought to be given variable weight, and if it's given any weight, it's probably the weight that she gave it, the judge co-gave it, in the permanent injunction patent law context, which is if they're really truly not selling it anymore, then there must not be much of a burden on them. I think we have your argument that we've obviously exceeded the time where we storied your rebuttal time, and since we're way beyond where we were, why don't we give you an extra 10 minutes, and we'll see where we don't feel compelled to use it. After your opening statement, can we start where we just ended, so we can get that part off the table? Thank you, Your Honor. You may have pleased the court. And I am returning to see you again after the preliminary injunction ruling, and I do want to say that causal nexus is the law that you've established, and that the circuit has established them, but I'm happy to start with trade dress first, if that's what Judge O'Malley would like. As I understand it, the trial court relied on the Avery-Denison case for the proposition that somehow, that actually says that if you're not continuing to practice, that you're therefore not entitled to an infraction. You don't seem to try to defend that in your briefs. You have other arguments, but you don't seem to try to defend that. We... What we defend is that Apple's cessation of practicing its trade dress, the only trade dress... Remember, the jury only found trade dress dilution, not infringement, and only on six products. And Apple has discontinued using the trade dress that the jury found dilution on. So you argue that... On both sides. Fair factors. I mean, it never even addressed what the trial court was saying it addressed. Your Honor, we would urge you to affirm the denial of the injunction on the trade dress on the ground that cessation on both sides is a relevant factor. And we think on our cessation, their cessation is a relevant factor. Let me explain why. What trade dress protection is about is source identification. If Apple... Remember, the jury found only dilution of the now-discontinued trade dress on the iPhone 3 and 3G products. So... And the trial court expressly found that there was no argument that anything that... that Apple's current trade dress is being diluted by anything that was proven... So under your theory... In fact, if someone... If Coca-Cola changes its can, that if someone infringes on the old Coke mark and dilutes the old Coke mark, Coke has no remedy? No, it might, Your Honor, but you'd have to prove that there was a diluting effect on the currently practiced mark. And the district court found, as a matter of fact, and it's not clearly erroneous, that there was no such diluting effect proved in this case. But if I could go on... But the jury found, as a matter of fact, that there was a diluting effect. On the trade dress employed in the now-discontinued iPhone 3 products. So the jury wasn't asked to and did not find a diluting effect on the current trade dress. Okay, so you're saying that Coke could never protect its old mark if it changed its can. No, we're not saying that at all. We're just saying that cessation is a factor. We actually think that it's a factor. Cessation on both sides is a factor. If there was proof of diluting effect on the current dress, then that would be a relevant factor perhaps warranting an injunction. That's a different law. That's a different law. And I do want to get back to the point to Judge Bryson's key point that we're talking here about whether injunctions are going to be used based on one verdict to stop infringement or dilution against new products in new cases. And I think the answer is the injunction should not be used here. And a contempt proceeding here, especially where we're talking about design patents and trade dress, which are amorphous, should not be used as a substitute for bringing actual cases of new infringement against new products. But if I could just address the other side of the trade dress balance and answer Judge Prost's question. You asked him how to interpret Ninth Circuit law. We think there is no conflict in Ninth Circuit law. We think the Vogt-Wagensberg case makes clear that Samsung's cessation of any trade dress dilution is a relevant factor to consider. And the Polo case is not to the contrary, it's just about burdens. So we think it's a matter of Ninth Circuit law you want to hold... I'm sorry, you want to be clear on why Polo is not to the contrary. Because Polo was just about who bears the burden of showing cessation as we read it. So we think that it's clear that the Ninth Circuit thinks that cessation is a relevant factor Well, it pretty much said it was not much of a relevant factor. Something you could consider, but it does carry very little weight because what the Polo court said was if you stopped using it then there shouldn't be any harm to you if we tell you not to use it anymore and if you really intend not to then it's no big deal. So unless you absolutely, positively establish and they cite some authority for those propositions that you never will use it and you're not using it then it really is not a factor. They reversed the entry of the permanent injunction on that ground. Your Honor, there's other factors that justify upholding the trade dress denial of injunction and we do want to urge you to hold it as a matter of law that irreparable harm should have been considered. We think 1125, subject to the principles of equity the language at the beginning of the statute means all the principles of equity that means all 40 of A factors and if you look at the irreparable harm it was actually amended in order to overrule the Supreme Court's decision that said you had to prove actual harm and the injunction statute is designed to say you don't need to show any harm requiring you to show irreparable harm because not having to show economic injury is not the same as not having to show irreparable economic injury or non-economic injury and the key point is that injunctions even for trade dress still have to be shown in our view to be related the dilution in this case or infringement has to be shown to be related to the harm and it wasn't shown here but I think that really takes us back to causal nexus if I could turn to that on causal nexus I want to respectfully disagree with my friend Mr. Lee that there's any ambiguity about whether causal nexus is a requirement for a patent infringement injunction in the permanent injunction context as well as the preliminary injunction context and in answer to Judge Crow's question what is the standard, it's already been set forth by this court it was set forth by this panel of this court in the preliminary injunction ruling that preceded the trial in this case and it was also set forth by a different panel of this court in the Galaxy Nexus case the so-called Apple II case but I'm not clear she added, did she not the district court judge here added a gloss which I'm not sure was apparent at least in Apple I and Apple II and that is this notion of aggregate that you don't consider the patents together even the design patents and utility patents your honor, interestingly actually the district court did not do that I think if you look at the language she said that Apple has failed on this record to show that any of its patented features on the design or the utility side are drivers of consumer demand she did not hold that anyone needed to be denied she said it but then she never really applied it the relevant sentences she said they haven't shown that these are drivers of consumer demand she specifically said that you had to prove the causal nexus on a patent-by-patent basis with respect your honor I don't think that Judge Crow was faithfully applying this circuit's guidance in Apple II which applied the causal nexus requirement on a patent-by-patent basis and was expressed in that regard Apple II said that the infringing feature singular must drive the consumer demand for the accused product she was faithfully applying what I would submit as already circuit law but let me be clear we don't argue here that you're foreclosed in future cases from finding that some aggregate combination of patented features drove consumer demand that's not foreclosed it's just that here Apple utterly failed to prove either that any patented feature singly or any set of patented features taken in the aggregate was even a driver of consumer demand and here I really need to focus the court back on what is the record in this case that could satisfy a causal nexus standard it boils down really just to two things one is terribly weak almost vanishingly insignificant evidence from consumer surveys what were the consumer surveys about and you can look at these for yourself and just see why the district court was correct that Apple didn't show that the patented features were even a driver of consumer demand, much less the driver at A33962 you'll see an example of the so-called design matters design at A33962 you'll see an example of the Apple survey evidence in which they say design matters and if you look at that you won't see anything about rectangular round cornered flat screen front of smartphones which is all of these 677 patent claims or you won't see anything about whether a front face with a bezel on the side which is all of the 087 patent claims or anything about whether the first page of a graphical user interface you won't see anything about any of the patented features on page A33962, you'll just see the term design design matters is far too broad to show any causal nexus between any of the design patents and an effect on consumer demand and you'll see the very same thing if you look at what is Apple's consumer evidence on the utility benefits I can tell you where it is, it's on page A32769 and a very similar example, they put in a lot of these but the best example is A32769 and A52037 and that's where ease of use, the term ease of use, easy to use is listed in a set of factors that consumers say they like now that has, ease of use is far too broad to encompass the narrow utility patented issue in this case I'm thinking about pinch to zoom or cat to zoom but there's still the portion of Apple's presentation that struck me as getting closest to the kind of specificity that you were saying was missing from the examples you've just explored was Dr. Hauser's testimony and I'd like you to talk about why it is that you think that testimony that says that customers would pay pretty significant amounts more for particular features why that isn't a pretty good proxy for a demand driver? I understand it's not exactly the same thing as asking do you believe that this product would make you this feature would make you buy that product but it's close, why not? It's not close at all your honor the reason is all that the Hauser survey asked was ask between two Samsung products would you pay $38 more for this feature it's an intra-brand price premium inquiry which doesn't correlate at all to what this court said is the relevant inquiry which is would you buy a Samsung phone that incorporated the infringing product over an alternative isn't that telling us what the consumer thinks in the context of Samsung's phones what the particular feature is worth no your honor to go back if I could since Mr. Lee raised it to your cupholder example in our prior case the fact that I pay $10 more to add a cupholder to a car I've already decided to buy does not tell me that the presence of the let's assume it's an infringing cupholder has led me to choose that car over it's a question of then evaluating the amount however if it turns out that this infringing feature leads to a doubling of the price as it otherwise would have been in the absence of that infringing feature then why isn't that at least a factor to consider in terms of causal nexus because it doesn't show anything about a comparison between a product with the infringing feature and the next non-infringing alternative the fact that the price doubles tells you only how much that feature is valued within a purchase of the product but it doesn't show you the key factor that your test asked about which is why I picked the product with the infringing feature over the non-infringing alternative the way that you're saying unless it drives the demand for the entire product there's never going to be a right to an injunction in a multi-faceted process no your honor we're saying as I said before it may be that some collection of features drives the product if Apple could have shown if you take three of these patents together and they add up to the dashboard or three of these infringing features together and they add up to the engine that might have been a different case add up to double the price of the phone it still doesn't tell you that the phone with the infringing feature will be chosen over the competing phone with a non-infringing alternative it doesn't tell you that consumer demand is driven by the infringing feature it just tells you that the consumer values that feature Judge Coe's theory doesn't allow them to add up anything one with the other she specifically said that each one has to be done on a patent specific basis and each one has to be the driver of consumer demand so do you agree with me as I asked Mr. Lee that if you prove one of them to be the driver you've proven yourself out of any right to injunctive relief despite the existence of a patent and the other features no we don't agree with that does that work logically in your argumentation? it does not, let me go back, I want to make something clear, it is not impossible as Apple has suggested to design a consumer survey that will actually satisfy the causal nexus standard in a complex product, this court found as to the D889 patent with respect to the Galaxy 10.1 tablet remember when we were here before Judge Coe had found that D889 was anticipated and you reversed on that ground and sent it back but she had found there was a nexus between consumer demand for the Galaxy 10.1 tab and its embodiment of the infringing design feature so it's not impossible that's the case of a complex product D889 didn't cover the rest of the product, the circuitry, the screen the software, but that was the case in which the product was so closely embodied the design patent, it was the entire case that was covered, unlike the D677 and the D087 here, which are much narrower, and that was the case in which causal nexus was met, so Mr. Lee is simply wrong this case itself proves that there's no categorical rule against finding that an infringing feature is a driver of consumer demand, but the ease of use and design matters evidence doesn't come close to showing, and the Hauser study can't show the comparative choice between the infringing the product with the infringing feature and an alternative product without the infringing feature if I might be willing to add a price premium to something I'm buying already, within the brand but it doesn't tell me that that's the reason why I've chosen the product now, I mean, I'm well, I just I think an economist would have difficulty with that assertion the one that you just made, because it seems to me that there's not very much difference between saying that let's change the cupholders to a hybrid engine if you have a car with a hybrid engine in it, and you say, ok how much is that hybrid engine worth to the consumer, well it's probably worth an extra $5,000 for people that end up with the hybrid engine version that's roughly what it costs now, if you say you can't have the hybrid engine, I may still buy the car without the hybrid engine if it's $6,000 cheaper, but that certainly is a demand related feature, right, because many people will pay $5,000 and if they can get it for only $4,000 more they'll grab it, that seems to me the essence of what driver of demand really is that's what I'm having difficulty with your saying if Hauser is really irrelevant to the inquiry here. Well, your honor, I'm not saying we do think Hauser is irrelevant to the inquiry you set forth, so you would be making new law to say that this kind of evidence is probative of consumer demand you've previously suggested in the prior cases that you have to show that the product is the driver of consumer demand for the product with the imprinting feature as compared with an alternative product, not whether it's an element of consumer demand within the product that you're looking at, and all Hauser asks is would you pay more for a Samsung phone if it has this product. Now by the way, we haven't talked about adequacy of monetary compensation if anything, the Hauser survey shows our point that Judge Koch properly found on, that Apple is fully capable of being of achieving a remedy here through monetary compensation if these prices are monetized if these features are monetizable as the Hauser survey just confirms that point but the real point that hasn't been mentioned yet, and I want to put it before you, is that Apple licensed all of its utility patents and licensed its unique user experience IP I was going to take you to that as the next point, so I'm glad you raised it, which is her analysis and she obviously was briefer here than in her other opinions, and we're grateful for that, but her analysis on the license issues seems to kind of ignore what I think is perhaps an important component she doesn't talk about the relationship that is she cites IBM HTC, she doesn't talk about the relationship between the parties, the licensing parties and how that compares to Apple Samsung, she also makes reference to the fact that her only, I think her only reference to the Apple Samsung relationship is that Apple offered to license some of its patents but Mr. Lee says, and I don't think it's beyond dispute that those were patents other than the ones at issue in this case aren't those factors at least relevant and shouldn't she have at least addressed those before placing so much weight on the licensing issues? First we think not, we think that the inquiry under adequacy of monetary compensation does not require a question about whether monetary compensation is sufficient as between the parties, what you have done as recently as the active video case is found that licensing, including licensing to non-competitors, is probative of the ability of money to satisfy the remedy for the infringement, so we don't think we think it would be too demanding for you to say that she wasn't entitled to look at those licenses unless she proved they were comparable. But if she doesn't look at them, does she make a determination? I mean, she said that Apple had to prove that its patented features were completely priceless. No, no, no, Your Honor, we strenuously disagree. She said that more than once though. No, Your Honor, what she was saying Apple was making a claim that it's blind by the record, that it didn't want to license its patents. That's wrong, and I want to focus, if I could, there's two very important pages in the record that I do want Congress to look at. One is page A 21957. Do you know which volume that is? 21957. Volume 3. If you look on that page, you'll see that Apple's own licensing executive, Mr. Texler, admits that Apple had licensed its unique user experience IP. And he explains in the surrounding pages that unique user experience IP includes all of the designs in this case. So, I want to first just make that the record is clear that every patent here was licensed. The utility patents were licensed to Nokia, IBM, and HTC. The design patents were licensed by Apple's own admission. And the other page I really want you to focus on, if I could, Your Honor, is page A 33916. Which volume is that? 33916. This is a... Volume 4. And I'm sorry to make you flip through all the volumes, Your Honor, but it's important because I think I want to be clear to you how strong the licensing record is here. And this also distinguishes some of your other post-eBay decisions where there was not a licensing history. We're not going to end injunctions in this case for cases where there isn't a licensing history, but here there is one. And here, Judge Croce is the most salient one. The offer to license to Samsung itself. On page A33916 you see the beginning, the crucial page in a long PowerPoint presentation that's all in the record. Here's an October 5th 2010 offer by Apple to license these products to Samsung itself. So we're not just relying on the licensing history with HTC and Nokia which are competitors. But they weren't still the same patent features, were they? They weren't licensing those patents. Actually they were, Your Honor. If I could, on page 33916 you'll see Samsung chose Apple would have preferred that Samsung request the license in advance. We are prepared to offer a royalty-bearing license for this category of device. And if you want to see Apple's admission that this category of device includes the patent that features Judge O'Malley, just look at Mr. Chexler's admission on page A21972 which is where Mr. Chexler, at trial, says that the license we offered to Samsung included our industrial design. And industrial design includes the design features. So, Your Honor, it was an offer to license the product and it included all of the patents that had taken place. So Judge Croce, if there's anything missing on the Apple-Samsung comparison, I respectfully submit that this is what I think you need to go so far. Mr. Chexler, a few pages later, specifically denies that this presentation encompassed what he refers to as the user experience patents. And that's at 22013. Correct, Your Honor. He walks it back there, but we just think it's belied by the documentary evidence. We never made a finding on that. I mean, that seems to me a significant and sharply contested issue, but there's no finding. So, we can't really conclude, I would think, that this page trumps Mr. Chexler's denial at exactly the same point, can it? Well, no. I think that if you look at the documentary evidence, it's not so you can't... If you have any doubt about that, you could remand on this issue, but there would be little point to it because the other licensing history is sufficient even without this specific licensing history. I'm just trying to answer Judge Crow's question about whether an Apple-Samsung comparison was made. I would submit that, in fact, the licensing history to others shows the adequacy of monetary compensation. And let's recall here that the point about the injunction is the injunction is really going to, and I want to talk about balance of hardships and public interest if I could for a moment. The sole real purpose of the injunction here since, as Judge Bryson observed, Samsung has ceased to make, we've discontinued all but three of the products, and it's undisputed that there's been a design around as to the features of the continuing products that were found to infringe. So, there is no more. Samsung is not practicing or embodying any of the features that are protected by Apple's patents. So, what Mr. Lee is asking you to do is essentially impose upon the district court, who faithfully follows your rulings, a requirement that you enter an injunction, the true purpose of which is really going to be to avoid Apple's need to come forward in future cases and prove infringement. We've already seen with the tab 10.1 patent that an injunction... So, they would have to prove infringement even if there is a contemporary. Your Honor, that's what the law requires, but you'll see that the injunction that Apple sought, the very overbroad injunction that Apple sought... No more than colorably different, but they don't... That standard language, in fact, it's implied within any injunction against a product. Well, the... Judge Coates correctly found that in this setting, you would be taking complex products away from the public. You would be imposing hardship on carriers and retailers. And there's lots of other products available. Why are you taking anything away from the public? Because, Your Honor, the carriers and retailers, as we saw in the tab 10.1 injunction context after it went back on remand and Judge Coates issued the preliminary injunction on the tab 10.1, we saw that the real harm was to carriers and retailers who were confused about what possible liability they would have for keeping inventory. And what evidence in the record did you present that carriers and retailers would be harmed if this injunction was issued? Well, we... The 10.1, we think, is probative of a... It's probative of... Did you submit affidavits from carriers and retailers? We did. We submitted evidence from the carriers, which is referenced in the record in page 51441. That's a reference to a brief, Your Honor, but it refers to the record in the Apple web preliminary injunction record. So you can look at the materials submitted in that record. But I really... And you're telling me there's affidavits from retailers and suppliers in that record? Not affidavits, Your Honor. Not affidavits. But I'd like to return to what I think is the central point before you, which is Mr. Lee has come before you, if I may just have a few extra minutes, Your Honor. Mr. Lee has come before you and said that we argued for a categorical rule against injunctions in complex product cases. That is not correct. And I want to point out how narrow the case before you is. It's what we think is a garden-variety, absolutely methodical application of the four debate factors to this case. And here's what's not at stake in this case. I think his suggestion that injunctions are going to be... We're going to come to death of injunctions in complex product cases. That's greatly exaggerated. And here's why. First, this case is just about lost sales and lost market share and lost downstream sales. And I really need to correct something that Mr. Lee, my good friend Mr. Lee, said earlier. He said twice that Judge Koch found that Samson's infringement caused irreparable harm. She didn't find that. He wouldn't be here if she hadn't. What she found is that Apple had suffered lost sales, but what she found was a causal nexus between infringement and lost sales or lost market share or lost downstream sales. So first, nothing in this case affects other kinds of harm. You may still issue injunctions or require issuance of injunctions in cases where the harm is something other than lost market share. Eye for eye, if somebody's destroyed your business line by bundling an infringing feature with a product, destruction of the business line, you're not going to reach this causal nexus. But the second point is we're not arguing for a categorical rule. There may be other cases where complex products don't have any licensing history. Or where the defendant can't pay. In Bosch against Pilon, one of the concerns you cited in sending the case back was that Pilon was a perhaps a judgment-proof defendant. So we're not ending injunctions in the classic case where monetary compensation can't suffice and there is no licensing history and the defendant can't pay. The third thing is we're certainly not suggesting that you can't uphold injunctions or send the case back to enter an injunction in a case where the patent is virtually co-extensive with the product. Something that might come up often, for example, in the pharma context. Or that might come up in the context, as we argued, of a very simple device, like an orthopedic nail or a snowplow latch lever or a windshield wiper blade, even if there were two patents on it, the chances, the more the patent is co-extensive with the product, the less likely there is to be any causal nexus limitation on an injunction because selling the product will be affected by infringing the patent. This is not that case. But even in a case where there are thousands of features embodied in an accused product, we're not eliminating injunctions, Your Honor. We're just saying Apple should have been held to its proof. And Apple didn't satisfy the proof here. And if I could just address one last... I'm sorry, Your Honor. Briefly. Very briefly, Your Honor. Thank you for indulging me with extra time. I must strenuously disagree with Mr. Lee when he said that there's additional evidence here justifying an injunction based on Samsung's so-called copying. There was no jury finding of copying. We strenuously disagree with the point that there was copying. We've given to you on pages 33 and 34 of the red brief evidence that was not before the jury. It was excluded based on a discovery ruling. But it was before the court in the post-trial proceeding. And obviously the concern about confusion to the jury was not present before the court. So we didn't copy. But even if we had, I'd just like to remind the court that Mr. Lee can't use copying as evidence to favor an injunction because this court has twice said that copying is irrelevant to consumers' perceptions. You said it in Apple I and Apple II. I don't recall that we said that it was irrelevant. It seems to me that we said it was not dispositive. Well, Your Honor, what you said in, if I may, Apple I, I like these passages very much. If I could just read them back to you, Your Honor. The relevant inquiry, which is Apple I in this panel, focuses on the objective reasons as to why the patentee lost sales, not on the offender's subjective beliefs as to why it gains them or would be likely to gain them. I think that's right when you said engineers get interested in a lot of things that consumers don't. Right, but I think just before that passage, I think we may have said something like, of course, the evidence of copying is definitely relevant. That was my recollection. You have the paper in front of you. It's relevant but not dispositive is what you said. That was just my point. But, Your Honor, in Apple II, if I could just... I think we have the case. We can all look at the case. But, Your Honor, we're not asking for a categorical end to injunctions. Please look at the record here and how there was no proof of any infringement here being a driver of consumer demand, much less the driver. And if Apple lost market share, the whole point of Puzzle Nexus is to distinguish between Apple losing market share based on Samsung's infringement and Samsung's legitimate competition. Thank you. We thank you. Okay. So now, in an effort to try to keep it as even as we can by my count, I think we'll give you seven minutes. I'll try to do it more quickly. Let me address 3.12. First, on the licensing, respectfully, there is nothing in the record that designed ads that were found to be infringed were licensed to anyone. There is nothing in the record that betrayed risk that was found to be licensed to anyone. The only reference to the design experience having been licensed is a pre-2002 cross-license with Microsoft. That was five years before the iPhone came to market. We're talking about a different set of design patterns. What about the document that Ms. Sullivan referred to? What Ms. Sullivan gave you was a page from the presentation that Apple made in an effort to prevent tax litigation from ever occurring. If you look at that page, you will see that there's no specific reference to these design patterns, to the trade dress, to the utility patents. Mr. Texel was asked specifically, did you offer to license Samsung any of the asserted patents or trade dress? The answer was unequivocally no. Were there other licenses and other patents? Just go with that carefully. There are licenses of some patents. There's no evidence that these design patents were licensed or the trade dress was licensed. But the utility patents have been licensed to HTC, Nokia, and IBM. I understand your argument with respect to IBM, they don't make phones. Your argument with respect to HTC is that this was a settlement of litigation, but Nokia? Your Honor, two things. Nokia is a settlement of litigation. Oh, was it also a settlement of litigation? Okay, but two of the utility patents, well, I guess that raises the question of why does it matter that it's a settlement of litigation? There doesn't seem to be any law for the proposition that you asserted in your brief that makes a big difference. Your Honor, I think I don't know if the Court's addressed this specifically, but it should make a difference. Because you don't want to discourage settlement of litigation. That's exactly right. If I could add two factors on these licenses, because I do think the standard of priceless or off-limits is the standard that you articulated. But in the HTC license agreement, and this is the importance of getting into the details, just against the standard, there was an anti-cloning provision. But not in the Nokia license agreement. Nokia wasn't even really a license to scan and steal provision, Your Honor, where during that period of time, you don't sue each other, but damages accrue. It's not a license. Damages are still accruing when the stand-and-steal period's over. You can sue and you can collect damages for that period of time. You're just not going to sue each other. So that was not a license? The overall thing is called a cross-license. When you get to the part that we're talking about with the utility patents, it's called a stand-and-steal. And so, actually, I think if you look at this question of adequacy of monetary damages, no evidence of licensing design patents. No evidence of licensing the trade fair. The three utility patents have been licensed twice in litigation, and once to a non-competitor. Second point is this. We're not saying, in answer to Jill Mellon's question, that there doesn't have to be some connection between the patent-to-feature adjudicated infringement and irreparable harm. In this case, Judge Koh found that the sales of the infringing products did cause lost downstream sales, lost market share. We are saying that to simply speak connection, that should be enough. And that is the way that I think you can reconcile all of this Court's 44-some decisions that have addressed this issue. After one and after two were in a preliminary injunction context and tried to we've had this evolution from some causation, which is an Apple I, to A driver to B driver. And that evolution takes us to a point where it is a categorical exclusion of a whole set of products that you would not get an injunction for. And even if it has to be A driver, at pages 8, 4, 5, 1, 4 to 8, 5, 1, 9, there is the information from Professor Hauser. And the 8, 4, 5, 1, 5 is demand is driven by features associated with infringed patents. I'm going to keep addressing this issue specifically. Well, but the argument that Mr. Seller is making is that, well, that's what he said he's addressing, but his survey evidence does not make that point. Could you briefly address? Your Honor, if someone is going to pay a price premium for a product, and that feature is in the product, that's an indication that it is at least A driver of consumer demand. Could I... If it's a large enough price, I mean, if it's I'll pay an extra five cents for the cup holder, you might conclude that's not driving demand in any material way. I think that's correct. But if $5,000 for a hybrid engine maybe they're concerned. Yeah, and I have to bet that folks and families would pay an extra $300 for the cup holders in their car. So, if it's enough, if it's enough... Well, I wouldn't. Because I can't afford it. I have grandchildren, so I would. Last point is this. As we read after one on this issue of copying, what the court said is the subjective mind of the Samsung engineers may not tell you what the consumers are thinking. We're not focused on the subjective mind. We're focused on what they did. They copied the features. You have in the record for you Exhibit 44 from the trial. It was a 145 page document. And on the left of every page, on the left was the iPhone, on the right was their phone, and at the bottom was a recommendation. And for host features, including features here, the recommendation was copy. The fact of copying as opposed to the subjective mind is relevant. It does demonstrate what's important to consumers. In fact, the fact that our primary competitor copied and felt it needed to be copied and it put down in writing that it was copying is probably the best indication that features are important. What do you say about Ms. Sullivan's reference to the page 33 of her brief, the Samsung phones during the evolution? There are two things, Your Honor. Ms. Sullivan correctly characterized it. It was excluded as a sanction for discovery of these. That's why it was excluded. At trial? At trial. But it was before the court, was it not, for the purpose of the injunction? It was before the court, without any explanation of what the phones were or what they did when they came into market. It was just there. And there was no consideration. The court did not consider it. Thank you. Thank you. We thank both counsel and the cases submitted. That concludes the hearing. All rise.